*Maryland Small MS4 Coalition, et al. v. Maryland Department of the Environment*
No. 25, September Term 2021

**Environmental Law – Administrative Law – Clean Water Act – Stormwater Discharge Permits – Stare Decisis.** Under the Clean Water Act and a similar State statute, the Maryland Department of the Environment develops and issues permits for regulating stormwater pollution to municipal separate storm sewer systems ("MS4s") in Maryland. In *Maryland Department of the Environment v. Anacostia Riverkeeper*, 447 Md. 88 (2016), in response to a challenge by environmental advocates, the Court of Appeals held that permits issued to "large" MS4s satisfied the minimum requirements of the Clean Water Act. In *Maryland Department of the Environment v. County Commissioners of Carroll County*, 465 Md. 169 (2019), *cert. denied*, 140 S. Ct. 1265 (2020), in response to a challenge by two counties that operate MS4s, the Court held that permits issued to those "medium" MS4s were lawful under the Clean Water Act even if some permit conditions exceeded the minimum requirements of the Act. In this case, a county operating a "small" MS4 challenges the general permit issued for 35 small MS4s in Maryland on grounds similar to those raised in the *Carroll County* case and asks the Court to reconsider its decision in that case. The Court holds that, pursuant to the doctrine of *stare decisis*, its prior holdings govern this case. Accordingly, the Court concludes that the general permit is not unlawful to the extent it may exceed a minimum requirement of the Clean Water Act known as the "MEP standard" to protect water quality standards and that, by including "minimum control measures" required by federal regulations under the Act and referencing areas beyond the MS4 service area, the permit does not unlawfully make the county responsible for discharges by third parties.

Circuit Court for Queen Anne's County
Case No. C-17-CV-18-000162
Argued: December 7, 2021

IN THE COURT OF APPEALS
OF MARYLAND

No. 25

September Term, 2021

MARYLAND SMALL MS4 COALITION,
ET AL.

V.

MARYLAND DEPARTMENT
OF THE ENVIRONMENT

*Getty, C.J.,
*McDonald
Watts
Hotten
Booth
Biran
Adkins, Sally D. (Senior
Judge, Specially Assigned),
JJ.

Per Curiam Opinion
McDonald, Hotten, and Adkins, JJ., concur.
Getty, CJ., Watts, and Booth, JJ., concur in
the judgment.

Filed: June 1, 2022

*Getty, C.J., and McDonald, J., now Senior
Judges, participated in the hearing and
conference of this case while active
members of this Court; after being recalled
pursuant to Maryland Constitution, Article
IV, Section 3A, they also participated in the
decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The goal of the federal Clean Water Act is to make the nation's waters fishable and swimmable by eliminating pollutant discharges into those waters.[1]  To achieve that goal, the Act requires a permit for all effluent discharges into waters of the United States, including discharges into the Chesapeake Bay and its tributaries.  Under the Act and the State water pollution control statute, Respondent Maryland Department of the Environment ("the Department") develops and issues such permits to municipal separate storm sewer systems ("MS4s") in Maryland, which are classified as "large," "medium," or "small."

Beginning in the 1990s, the Department issued permits for owners and operators of large and medium MS4s.  In 2016, in response to a challenge by environmental advocates, this Court held that permits issued by the Department to large MS4s satisfied the minimum requirements of the Clean Water Act.  *Maryland Department of the Environment v. Anacostia Riverkeeper*, 447 Md. 88 (2016) ("*Anacostia Riverkeeper*").  In 2019, in response to a challenge by two counties that operate medium MS4s, the Court held that permits issued to those MS4s were lawful under the Clean Water Act even if some permit conditions exceeded the minimum requirements of the Act.  *Maryland Department of the Environment v. County Commissioners of Carroll County*, 465 Md. 169 (2019), *cert. denied*, 140 S. Ct. 1265 (2020) ("*Carroll County*").  In *Carroll County*, the counties asserted, among other things, that the permit terms unlawfully (1) included requirements

---

[1] *See* 33 U.S.C. §1251(a).

that went beyond the Act's "maximum extent practicable" ("MEP") standard and (2) regulated areas of a county outside the MS4's watershed region.

In this case, Petitioner Queen Anne's County ("the County"), which operates a small MS4, brought this action for judicial review of a general permit that the Department issued for operators of 35 small MS4s in Maryland, including the County. The Circuit Court for Queen Anne's County concluded that the decision in *Carroll County* addressed the issues raised by the County and affirmed the permit. On appeal of that decision, the Court of Special Appeals reached the same conclusion. Before us, the County again raises the grounds that the Court addressed in *Carroll County* and asks the Court to reconsider its key holdings in that case.

We hold that, pursuant to the doctrine of *stare decisis*, the holdings of *Carroll County* apply in this case. We hold that this case is governed by this Court's prior case law and presents neither a material difference nor a change in circumstance that would justify reconsideration of this Court's *Carroll County* decision. Accordingly, conditions based on regulations of the Environmental Protection Agency ("EPA") in the general permit for small MS4s are not unlawful simply because they may exceed the minimum requirements of the Clean Water Act, such as the MEP standard. In addition, an impervious surface restoration requirement in the permit, which is similar to but less onerous than a permit

2

requirement assessed in *Carroll County*, does not unlawfully make the County responsible for discharges by third parties.[2]

# I

## Regulation of Water Pollution under the Clean Water Act

Pollution can enter waterways in many ways, but the Clean Water Act[3] sorts all sources of pollution into two categories – point source and nonpoint source pollution. *Carroll County*, 465 Md. at 184. The Clean Water Act defines "point source" as "any discernible, confined and discrete conveyance," and thus includes classic conveyances such as an industrial drainage pipe. 33 U.S.C. §1362(14). Undefined by the statute, "nonpoint source" includes dispersed runoff from rainwater or snowmelt that sweeps over buildings, farms, and roadways, and that carries pollutants and pesticides into navigable waters, their tributaries, and groundwater. *See Carroll County*, 465 Md. at 184 & n.3. Given the unpredictable and amorphous nature of nonpoint source pollution, the Clean

---

[2] Four members of the panel – Judge McDonald, Judge Hotten, Judge Biran, and Judge Adkins – join this per curiam opinion. Three members – Chief Judge Getty, Judge Watts, and Judge Booth – join in the judgment, but not the per curiam opinion.

Judge McDonald has filed a concurring opinion, which Judge Hotten and Judge Adkins join. Judge Watts and Judge Booth have each filed concurring opinions and join each other's concurring opinion. Chief Judge Getty joins both Judge Watts' and Judge Booth's concurring opinions.

[3] Formally, the name of the statute is the Federal Water Pollution Control Act, which was significantly amended in 1972 to create the pollution discharge permitting program that is at the foundation of this case. However, practitioners and courts (including the Supreme Court) have adopted the "more appealing" name "Clean Water Act" associated with certain 1977 amendments of that statute to refer to these provisions. *See* Jeffrey G. Miller, *The Supreme Court's Water Pollution Jurisprudence: Is the Court All Wet?*, 24 Va. Envtl. L.J. 125, 131 n.30 (2005).

Water Act primarily targets point sources of pollution, using point source permits as its primary enforcement mechanism. *Id.* at 184.

### A. Point Sources and NPDES Permits

As a starting point, the Clean Water Act prohibits all point source pollutant discharges into the waters of the United States,[4] unless a permit allows the discharge. 33 U.S.C. §§1311(a), 1362(12); *see Anacostia Riverkeeper*, 447 Md. at 96. Thus, as a general rule, to lawfully discharge from a point source into a waterway such as the Chesapeake Bay or its tributaries, one must have a permit, *i.e.*, a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §1342. NPDES permits set effluent limitations[5] for point source discharges, capping the amount of various pollutants that may enter the water. *Id.* The standards are primarily based on what is reasonably achievable with available technology, but permit standards become more stringent if further reduction of pollutants is necessary to protect water quality. 33 U.S.C. §1311(b)(1).

Congress entrusted administration of the NPDES permit program primarily to the EPA. 33 U.S.C. §1319, 1342(a)(1). The EPA may delegate that authority to a state so long as the state's law establishes a parallel permitting program consistent with the Act. 33

---

[4] Undefined by the statute, the precise scope of the phrase "waters of the United States" has sometimes been the subject of litigation. *See, e.g.*, *Rapanos v. United States*, 547 U.S. 715, 724 (2006) (plurality opinion). This case does not present that issue, as there is no question that the Chesapeake Bay and its watershed fall within the jurisdiction of the Clean Water Act. *See also* 33 U.S.C. §1267.

[5] An "effluent limitation" is "any restriction established by a State or the [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of a contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. §1362(11).

U.S.C. §1342(b). EPA designation of a state permitting agency indeed is the rule rather than the exception.[6] In Maryland, the Department is the NPDES permitting authority. *See* Maryland Code, Environment Article ("EN"), §9-253; COMAR 26.08.04.01. The State water pollution control law also directs the Department to adopt regulations concerning water quality standards and to regulate the discharge of pollutants into Maryland waterways. EN §9-314.

**B.     *Effluent Limitations in Point Source Permits***

Although the Act distinguishes between point and nonpoint sources of pollution, pollutants do not, and accomplishment of the statutory purpose inevitably involves some interplay in the regulation of the two sources of pollution. Under the Act's statutory framework, nonpoint source pollution affects the stringency of a typical NPDES point source permit. Aside from technical limitations on effluent discharges, typical NPDES permits – for example, a permit for an industrial drainage pipe – must include "any more stringent limitation, including those necessary to meet water quality standards." 33 U.S.C. §1311(b)(1)(C); 40 CFR §130.7(c)[7]; *see Carroll County*, 465 Md. at 187. "Water quality standards" are targets set by the states and approved by the EPA. 33 U.S.C. §1313. Among

---

[6]     *See* EPA, *NPDES State Program Authority*, (May 17, 2022), https://www.epa.gov/npdes/npdes-state-program-authority     [https://perma.cc/RBU3-Z2YQ] (listing only Massachusetts, New Hampshire, and New Mexico as states without any delegation of NPDES program authority).

[7] *Cf.* COMAR 26.08.03.01C(2)(b) ("Best available technology shall be required as the minimum for all permitted discharges. If it is determined that compliance with the established water quality standards will not be achieved through [best available technology], additional treatment shall be [required].").

other things, water quality standards are based on designated uses for the state's bodies of water, such as "recreation" or "public drinking water supply." *See Carroll County*, 465 Md. at 186.

Both point and nonpoint sources impact water quality, but the Act's enforcement mechanism is through point source permits. Thus, if there is an excess of nonpoint source pollution impairing a body of water – despite the measures taken to reduce nonpoint source pollution – point source permits must impose a "more stringent limitation" to counterbalance the nonpoint source pollution and protect the water quality. "Water quality standards are retained as a supplementary basis for effluent limitations, however, so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 n.12 (1976). Thus, water quality standards provide the link for how point source regulation under the Act accounts for nonpoint source pollution. *See American Farm Bureau Federation v. EPA*, 792 F.3d 281, 299 (3d Cir. 2015); *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 143 (D.C. Cir. 2006).

**C.     MS4s**

MS4s are a subset of point sources of pollution discharges. They are ubiquitous in the daily life of those who live in an urban or suburban area. They consist of drains along roads and other conveyances for the collection and transport of rainwater and snowmelt – and everything else washed in with the water. Unlike a combined sewer system, an MS4 does not mix run off with sanitary sewer water; rather, it collects, transports, and deposits

6

untreated stormwater into local waterways.  In 1987, Congress amended the Clean Water

Act to include specific permitting standards for MS4s, which have been elaborated in the

EPA's regulations.[8]  *See* 33 U.S.C. §1342(p); 40 CFR §§122.30-.37.

The fundamental issues in this case are whether the Department, as the NPDES

permitting authority for Maryland, may mitigate nonpoint source pollution to protect water

quality standards when issuing permits for point sources, such as MS4s, and, if so, whether

the scope of such regulation may extend in certain ways beyond the MS4's system.  The

Court has already answered these questions in the affirmative – once with large MS4s and

once with medium MS4s.  The same answers pertain to small MS4s.

## II

### Permitting of MS4s – Standards and Process

A.    *New Statutory Standard with a Phased Approach*

The Clean Water Act provides for a phased, flexible approach to the permitting of

MS4s.  In particular, the Act states:

Permits for discharges from municipal storm sewers—

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater
discharges into the storm sewers; and

---

[8] After the initial passage of the Clean Water Act, the EPA attempted to exempt
MS4s from the permitting requirement for point sources.  A federal court of appeals held
that the EPA lacked authority to grant such an exemption.  *Natural Resources Defense
Council, Inc. v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977).  In 1987, Congress amended the
Act to phase in the permitting of MS4s and to provide specific permitting standards for that
purpose.  Water Quality Act of 1987, Pub. L. No. 100-4, 101 Stat. 7, 69 (1987); *see also
Anacostia Riverkeeper*, 447 Md. at 96-100 & nn.3, 6; *Carroll County*, 465 Md. at 243-46.

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

33 U.S.C. §1342(p)(3)(B).

The phased approach to MS4 permitting was adopted to allow additional time for the development of those permits. The time was needed because the standard end-of-the-pipe treatment technology used for typical NPDES point sources would not be effective and permitting authorities would have to develop new types of permits that would be more comprehensive than the typical NPDES permit. A key legislative advocate of the 1987 MS4 amendments stated during the floor debate that the MS4 permits would "go far beyond the normal permits" and be "in effect … programs for stormwater management…." Remarks of Senator Robert R. Stafford (R. Vt.), Chairman of the Senate Committee on Environment and Public Works, presenting the Conference Report on Water Quality Act of 1986, 132 Cong. Rec. at 32381 (October 16, 1986).[9]

The EPA has implemented the MS4 permitting program in two phases. Phase I involved permitting those systems with the greatest potential to pollute waterways, generally as defined by population – denominated "large" or "medium" MS4s – or as specially designated by the permitting authority. *Carroll County*, 465 Md. 243-45. In Maryland, the Department began issuing those permits during the 1990s. Some challenged

---

[9] Although the Water Quality Act of 1986 was passed by Congress, it was pocket-vetoed by President Reagan. In early 1987, Congress again passed the bill as the Water Quality Act of 1987 and, when the President vetoed the bill, overrode the veto. The bill was enacted as Public Law 100-4.

the permits as too stringent (*Carroll County*); others challenged the permits as not stringent enough (*Anacostia Riverkeeper*). In both instances, this Court held that the permits were lawful under the EPA's regulations and the Clean Water Act. *See* Part III of this opinion.

Phase II included "small" MS4s – generally MS4s serving an area that has a population of less than 100,000 and either includes an urbanized area or is specially designated by the permitting authority. *See* 40 CFR §122.32(a). The EPA adopted regulations for the permitting of Phase II MS4s in 1999 and updated those regulations in 2016. *See* Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722 (Dec. 8, 1999) ("EPA 1999 Small MS4 Permit Regulations"); National Pollutant Discharge Elimination System (NPDES) Municipal Separate Storm Sewer System General Permit Remand Rule, 81 Fed. Reg. 89,320 (Dec. 9, 2016) ("EPA 2016 Small MS4 Permit Regulations");[10] *see also Carroll County*, 465 Md. at 245. In Maryland, the Department first issued a general permit for small MS4s in 2003.[11] This case concerns the second generation of that general permit.

---

[10] The initial Phase II regulations were challenged in federal court. While the court largely rejected those challenges, it remanded those regulations back to the EPA because they lacked procedures for review by the permitting authority, public notice, and the opportunity to request a hearing. *Env't Def. Ctr. v. EPA*, 344 F.3d 832, 840, 843 (9th Cir. 2003); *see also* EPA 2016 Small MS4 Permit Regulations, 81 Fed. Reg. at 89,323.

[11] *See* Maryland Department of the Environment, *Maryland's NPDES Municipal Separate Storm Sewer System (MS4) Phase II General Permits*, https://mde.maryland.gov/programs/water/stormwatermanagementprogram/pages/npdes_ms4_new.aspx [https://perma.cc/B9CC-5AMF].

### B.    EPA Standards for Small MS4 Permits

#### 1.    Terms and Conditions

The EPA regulations for small MS4 permits set forth standard permit conditions, a few of which are particularly pertinent to this case.  First, any small MS4 permit "must include permit terms and conditions to reduce the discharge of pollutants from the MS4 to the maximum extent practicable (MEP), to protect water quality, and to satisfy the appropriate water quality requirements of the Clean Water Act."  40 CFR §122.34(a).[12] Permit terms "may include narrative, numeric, or other types of requirements."  *Id.*

Second, a small MS4 permit must include six specific minimum control measures: (1) Public education and outreach on storm water impacts; (2) Public involvement/participation; (3) Illicit discharge detection and elimination; (4) Construction site storm water runoff control; (5) Post-construction storm water management in new

---

[12] This opinion, like the EPA's MS4 regulations, uses the acronym "MEP" as a shorthand for the phrase "maximum extent practicable."  It is but one of the many terms of art in environmental law that are perhaps better known by their acronyms than their formal names.  The Clean Water Act and its regulations have spawned a plethora of such terms and acronyms – for example, the BMP ("best management practices") that may be deployed to achieve the MEP standard or beyond.  In addition, under the Act, pollutant discharges are to be initially controlled with BPT ("best practicable control technology"), followed by later imposition of the more stringent BATEA ("best available technology economically achievable"), whereas non-toxic pollutants are subject to the ostensibly less stringent standard of BCT ("best conventional-pollutant control technology").  *See* 33 U.S.C. §§1311(b)(1)(A), 1311(b)(2)(A), 1311(b)(2)(E).  The Act assigns new sources their own standard – BADT ("best available demonstrated control technology").  33 U.S.C. §1316(a)(1).  While these acronyms have their uses, they can sometimes make analysis challenging.  *See  Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 220-21 (2009) (attempting to analyze an issue by setting a hierarchy of standards under the Act – each standard known by an acronym and each beginning with the word "best").

development and redevelopment; and (6) Pollution prevention/good housekeeping for municipal operations.  40 CFR §122.34(b).

Finally, as appropriate, the permit is to include "[m]ore stringent terms and conditions, including permit requirements that modify, or are in addition to, the minimum control measures based on an approved total maximum daily load (TMDL) or equivalent analysis, or where the [permitting authority] determines such terms and conditions are needed to protect water quality."  40 CFR §122.34(c).  In the context of this regulation, the acronym "TMDL," which stands for "total maximum daily load," refers to the level of a pollutant that a water body can tolerate without violating applicable water quality standards.  33 U.S.C. §1313(d)(1)(C); 40 CFR §§130.2(i), 130.7(c)(1); *see generally Carroll County*, 465 Md. at 190-93.  State permitting agencies across the United States have developed a wide variety of such conditions in MS4 permits to protect water quality.[13]

2.      Impervious Surfaces, Urbanization, and Small MS4s

Impervious surfaces that do not absorb rainwater have long been recognized as a key cause of water pollution and the resulting impairment of water quality, particularly in

---

[13] For example, MS4 permits in other states have conditions such as installing animal waste collection stations at municipal parks (Washington), retrofitting at least 18 million square feet (0.65 square miles) of impervious surface during the permit term (Washington, D.C.), removal of more than 100,000 pounds of trash annually from waterbodies (Washington, D.C.), distributing and planting 4,000 trees to improve pollutant uptake (Arlington Co., VA), investigating and creating an inventory of pollutant sources (Pennsylvania), routinely cleaning sewers (Denver, CO), pre-wetting of road ice (New Hampshire), and installation of new dog waste clean-up signs and bag dispensers (San Francisco, CA).  EPA, *Compendium of MS4 Permitting Approaches, Part 3: Water Quality-Based Requirements* (Apr. 2017), https://www.epa.gov/sites/default/files/2017-06/documents/part3-sw_compendium_wqbels_508.pdf [https://perma.cc/C6TS-Z7Z7].

urban areas. EPA 1999 Small MS4 Permit Regulations, 64 Fed. Reg. at 68,725. Typically, stormwater drains into the natural vegetation and soil, which act as a natural filter for many pollutants. *Id.* With increased development and the proliferation of impervious surfaces – roofs, driveways, roads, and parking lots – the ground no longer absorbs and filters the stormwater as effectively. *Id.* Instead, stormwater washes over those surfaces, picking up pollutants along the way while gaining speed and volume. *Id.* What results is a stormwater flow with greater volume, pollutants, and temperatures that directly impairs nearby receiving waters. *Id.*

When the EPA initially adopted the small MS4 regulations, it noted that this phenomenon is especially true for the Chesapeake Bay region. EPA 1999 Small MS4 Permit Regulations, 64 Fed. Reg. at 68,725. It pointed to a modeling system developed for the Chesapeake Bay that demonstrated that contamination of the Bay and its tributaries from runoff is comparable to, if not greater than, contamination from industrial and sewage sources. *Id.* (citing R. Cohn-Lee & D. Cameron, *Urban Stormwater Runoff Contamination of the Chesapeake Bay: Sources and Mitigation*, 14 The Environmental Professional 10-27 (1992)). The EPA specifically targeted small MS4s located in urbanized areas for regulation because "studies and data show[ed] a high correlation between degree of development/urbanization and adverse impacts on receiving waters due to storm water." *Id.* at 68,751.

3.    Choice of General Permit or Individual Permit

The regulations for permitting small MS4s provide some administrative flexibility for small MS4 permittees. In contrast to federal regulations governing large and medium

MS4s, the regulations for small MS4s strongly encourage the use of general permits applicable to multiple MS4s to reduce administrative costs and burden. *See* 40 CFR §§122.28(d); *see also* EPA 1999 Small MS4 Permit Regulations, 64 Fed. Reg. at 68,737. The owner or operator of a small MS4 may either accept the terms of a general permit or opt for an individual permit for its system. *See* 40 CFR §122.33(b). Moreover, the owner or operator of a small MS4 located within the same urbanized area jurisdiction as a medium or large MS4 may seek to be listed as a limited co-permittee with the larger MS4 permittee. 40 CFR §122.26.

## C.      *MS4 Permitting Process in Maryland*

In Maryland, discharge permits are issued under both the Clean Water Act and a parallel State program. *Carroll County*, 465 Md. at 185. The process by which the Department issues such permits is set forth in EN §1-601 *et seq*. The Department is to publish notice of applications for permits. EN §1-602, 1-603. The Department publishes notice of a "tentative determination," which includes a draft permit available for public inspection and copying, and certain other documents. EN §§1-604, 1-606(d). The notice is followed by a period during which the Department may receive written comments on the draft permit and hold a public hearing. EN §1-604(a)(3)-(4). In certain circumstances, such as when it receives comments adverse to the tentative determination, the Department is to proceed to issue a final determination. EN §1-604(b). If no adverse comments are received and no other circumstances require preparation of a final determination, the tentative determination becomes the Department's final decision on the permit. EN §1-

604(b)(3).  This permit process is not considered to be a contested case proceeding for purposes of the Maryland Administrative Procedure Act.  EN §§1-101(b), 1-601(b).

A final determination of the Department is subject to judicial review by a party that meets threshold standing requirements and that participated in the public comment process.  EN §1-601(c).  Judicial review is based on the administrative record before the Department.  EN §§1-601(d), 1-606(c).  That record consists of, among other things, the draft permit, the Department's written basis for its final determination, documents supporting the stated basis, comments on the draft permit, responses to any such comments, and tapes and transcripts of public hearings.  EN §1-606(c).  Judicial review is limited to issues raised during the public comment process, unless the objections were not reasonably ascertainable during that process or arose afterward.  EN §1-601(d).

Judicial review begins in the relevant circuit court[14] pursuant to the procedures set forth in EN §1-601 *et seq*. and Maryland Rule 7-201 *et seq*. (rules governing actions for judicial review when a statute authorizes such review).  There is a right to appeal the decision of the circuit court to the Court of Special Appeals.  EN §1-601(e)(2).

### III

### Prior Maryland Decisions Concerning MS4 Permits

As noted earlier, this Court has previously reviewed challenges to MS4 permits issued by the Department in two cases.  One case involved permits issued to five jurisdictions that operated systems designated as "large" MS4s; the other case concerned

---

[14] Venue is appropriate in a circuit court for a county in which the activity governed by the permit will occur.  EN §1-601(e)(1).

permits issued to two counties that operated systems designated as "medium" MS4s. Each of the permits involved similar terms and conditions. In the first case, environmental advocates challenged permit terms as not stringent enough to satisfy the Clean Water Act; in the second case, the counties challenged their respective permits as too stringent and exceeding the Department's authority under the Act. In both cases, this Court affirmed the Department's authority and obligation to regulate MS4 discharges through the permits in question.

## A.    *The* Anacostia Riverkeeper *Case*

*Anacostia Riverkeeper* involved large MS4 permits that the Department had issued to five counties at various times between 2010 and late 2014. 447 Md. at 113. Each permit required the permittee to complete restoration efforts with respect to 20 percent of its jurisdiction's total impervious surface not already restored to the MEP standard. *Id.* at 123. In 2014, the Anacostia Riverkeeper and other environmental groups challenged the permits as *not stringent enough*. They argued, among other things, that the requirement that the permittees restore 20 percent of impervious surface in its jurisdiction was "too opaque" because the permit left permissible mitigation practices undefined and thus allowed the permittees to choose their own stormwater management practices. *Id.* The environmental groups argued that the Department could not be certain that such a nebulous requirement would in fact reduce pollution, let alone reduce it to at least the MEP standard, as required by the Clean Water Act. *Id.* The Court of Special Appeals agreed with the challengers. It concluded that the permits set "aspirational goals rather than particularized objectives" and

15

held that they failed to satisfy federal and State MS4 permit standards. *Md. Dept. of the Env't v. Anacostia Riverkeeper*, 222 Md. App. 153, 176 (2015).

This Court disagreed. The Court described the role of TMDLs in setting water quality standards for discharge permits. *Anacostia Riverkeeper*, 447 Md. at 100-04. The Court emphasized that, unlike a typical NPDES permit, a permit for an MS4 need not require the numerical specificity that might be found in a typical NPDES permit. 447 Md. at 126. Rather, the Clean Water Act affords the Department significant flexibility in establishing controls for MS4 permits – which is necessary, given the challenges in regulating what goes in and comes out of a storm sewer system. *Id.* at 127. Thus, the Court held that the 20 percent impervious surface restoration requirement satisfied both the State stormwater permitting standards and the MEP standard in the Clean Water Act. *Id.* at 126, 128-29.

## B. *The* Carroll County *Case*

Three years later, conditions in Maryland MS4 permits were challenged from the opposite perspective. In that case, two counties that operated medium MS4s argued, among other things, that conditions similar to those at issue in *Anacostia Riverkeeper* required *too much* of the counties and exceeded the requirements of the Clean Water Act. *Carroll County*, 465 Md. at 199-200. A few key holdings from that case are particularly pertinent to this appeal.

### 1. Going Beyond the MEP Standard to Protect Water Quality

As in *Anacostia Riverkeeper*, a key aspect of the permits at issue in *Carroll County* was a 20 percent restoration requirement for untreated impervious surfaces. 465 Md. at

16

199. The purpose of that permit condition was to reduce stormwater pollution discharged into the Chesapeake Bay to protect water quality, regardless of whether that pollution travelled directly into the Bay or first detoured through the county's sewer systems.

One of the counties argued that the impervious surface restoration requirement exceeded the statutory MEP standard of the Clean Water Act and was therefore unlawful. The county and the Department appeared to agree that this permit condition went beyond the MEP standard. *Id.* at 213. Thus, one of the issues in *Carroll County* was whether the terms of an MS4 permit could go beyond the MEP standard in order to satisfy water quality standards.

In its opinion in that case, this Court noted that, in a typical NPDES permit, there would be no question that the Department is to consider water quality standards in designing a permit – in fact, such consideration is required by the Act. Typical point source permits must impose technology-based limitations on discharges as well as "any more stringent limitation … necessary to meet water quality standards." *Carroll County*, 465 Md. at 187 (quoting 33 U.S.C. §1311(b)(1)(C)). Thus, "regardless of whether a waterway is over-polluted due to point sources, nonpoint sources, or some mixture of both, the Act authorizes the imposition of water quality based controls on point sources, in addition to the most stringent technology based controls." *Id.*; *see also EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 n.12 (1976).

The Court also observed that an MS4 permit is not a typical NPDES permit; MS4s differ from "end-of-pipe" point sources and have a different permit standard. *Carroll County*, 465 Md. at 188-89. Although MS4s are classified as point sources and the EPA

17

chose to regulate MS4s within the framework of the NPDES program, NPDES permits for MS4s are more flexible and implement pollution mitigation programs that serve as surrogates for typical NPDES requirements. *Id.* at 234-37. Thus, the question in *Carroll County* was whether this more flexible approach for MS4 permits likewise allowed consideration of water quality standards to set conditions that went beyond the MEP standard.

To answer that question, the Court looked to the text of the statute, the EPA's regulations, and prior case law considering the issue. The Court concluded that a permit could include conditions beyond the MEP standard to satisfy the water quality standards established for the Chesapeake Bay and its tributaries.

The Court first turned to the text of the statute. Under the Clean Water Act, MS4 permits "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, *and such other provisions as the [EPA] Administrator or the State determines appropriate* for the control of such pollutants." *Carroll County*, 465 Md. at 215, *quoting* 33 U.S.C. §1342(p)(3) (emphasis added). The county argued that "such other provisions" were limited to what was necessary to satisfy the MEP standard, and therefore the MEP standard set a ceiling on MS4 regulation. *Id.* at 216. This Court rejected that argument, holding that the phrase "such other provisions" authorized the Department to

include permit conditions in addition to the MEP baseline in order to satisfy water quality standards. *Id.* at 217.[15]

Observing that the EPA was entitled to deference concerning its interpretation of the Clean Water Act in its regulations, the Court then considered the EPA's MS4 regulations. The EPA's position for many years was that MS4 permits (like typical NPDES permits) must achieve compliance with water quality standards. 465 Md. at 219 & n.47. At first, the EPA based this conclusion on the requirement that typical NPDES permits must include "any more stringent limitation … necessary to meet water quality standards." *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1164 (9th Cir.), *opinion amended on denial of reh'g*, 197 F.3d 1035 (9th Cir. 1999); 33 U.S.C. §1311(b)(1)(C). The Court noted that the EPA's initial position was partially rejected by a federal appellate court, which held that the Clean Water Act did not compel, but rather conferred discretion on, MS4 permitting agencies to include permit conditions based on water quality standards that exceed the MEP standard. 465 Md. at 219-20 (citing *Defenders of Wildlife v. Browner*, 191 F.3d at 1164). In response to that decision, the EPA had modified its interpretation of the statute in accordance with that decision, and provided that permitting agencies had discretion to include effluent limitations beyond the MEP standard in MS4 permits to satisfy water quality standards. *Id.* at 220-21.

---

[15] The Court also examined the legislative history of the Water Quality Act of 1987, which had amended the Clean Water Act to include the phased MS4 permit program. *Id.* at 218. Upon review of federal legislators' generalized, aspirational statements, the Court concluded that the legislative history was "not especially illuminating" on this particular issue. *Id.*

The Court concluded that the Department, in developing the permits at issue in *Carroll County*, had "acted consistently with the EPA's interpretation of [the Act] – that is, that the Act authorizes permitting agencies to include water quality based effluent limitations in MS4 permits without reference to the MEP standard." *Carroll County*, 465 Md. at 224. The Court further reasoned that the EPA's interpretation was a reasonable construction and deserved deference. *Id.* Accordingly, the Court held "that the Department did not act unlawfully in including a water quality based effluent limitation (the impervious surface restoration requirement) not subject to the MEP standard in the County's permit." *Id.*[16] The Court also rejected the county's argument that, even if permissible under the Act, the impervious surface restoration requirement was arbitrary and capricious. *Id.* at 224-27.

2.    The Geographic Scope of an MS4 Permit Condition

Another key issue in *Carroll County* involved the geographic scope of an MS4 permit. Both counties argued that, regardless of whether a permit could implement requirements based on water quality, the scope of the regulatory conditions in a permit was necessarily limited to the specific discharges authorized by the permit. *Carroll County*, 465 Md. at 229. In their view, reference to a county-wide baseline of untreated impervious surface area for calculation of the 20 percent restoration requirement "effectively ma[de]

---

[16] The county did not ask the Court to reconsider its holding that permit conditions could exceed the MEP standard. Nor was it one of the issues in the petition for *certiorari* filed by the other county that was later denied by the Supreme Court. *See County Commissioners of Carroll County v. Maryland Department of the Environment*, Pet. No. 19-592, 2019 WL 5802018.

the Counties responsible for pollutants carried by stormwater that does not flow into their MS4s." *Id.*

In addressing this issue, the Court first noted that nothing in the permit required the counties to undertake restoration requirements outside of the geographic area that drained into the MS4. 465 Md. at 230. The counties could undertake the 20 percent restoration requirement exclusively within the service area of the respective MS4s such that all improvements designed to comply with the restoration requirement affected only stormwater runoff that first entered an MS4 prior to entering the Chesapeake Bay, rather than stormwater runoff that headed straight for the Bay. The permit imposed no limitation on where the improvements could be made; the broader scope provided greater flexibility to the counties than if it had mandated improvements solely within the MS4 watershed.

Moreover, the Court found that nothing in the text of the Clean Water Act explicitly mandated that these "best practices" occur within the geographic area of the MS4 system. Rather, the Act allowed permits to be issued on a "system-wide" or "jurisdiction-wide" basis. 33 U.S.C. §1342(p)(3)(B)(i); 465 Md. at 228. The Court concluded that "the Department's use of a county-wide baseline as a reference point for calculating the impervious surface restoration condition [did] not exceed the Department's authority under the Act because the impervious surface restoration condition [is] designed to achieve water quality standards." 465 Md. at 235.

Nevertheless, the counties argued that the Department's use of a county's total impervious surface area as a baseline for the 20 percent restoration requirement exceeded the agency's authority under the Clean Water Act. *Carroll County*, 465 Md. at 231.

21

According to the counties, an MS4 permit condition could only use a baseline that related directly to discharges of pollutants from the MS4 itself. *Id.* at 232-33.

The Court found that such an argument undermined the permitting agency's authority to protect water quality. MS4 permits, like typical NPDES permits, may account for nonpoint source pollution via protection of water quality standards. While a typical NPDES permit accounts for nonpoint source pollution by increasing the stringency of effluent limitations, no such effluent limitation is possible for MS4 discharges. *Carroll County*, 465 Md. at 234, 236 n.66. Instead, the Court noted, MS4 permits impose pollution mitigation programs, such as an impervious surface restoration requirement, as a proxy for a more stringent effluent limitation. *Id.* at 234.

3.      Summary

In sum, pertinent to this case, the Court held: (1) an MS4 permit may include conditions that go beyond the MEP standard in order to satisfy water quality standards, and (2) such permit conditions may reference areas beyond the boundaries of the MS4 system.[17]

## IV

## The Present Case

This case involves a challenge by Queen Anne's County to the terms of the general permit for small MS4s developed by the Department.

---

[17] In *Carroll County*, the counties also objected to their designation as Phase I jurisdictions, asserted that the permits should have provided a water quality trading option, and challenged a somewhat ambiguous permit condition requiring them to cooperate with other entities carrying out responsibilities under State law. The Court rejected those challenges. *Carroll County*, 465 Md. at 242-63. Those holdings are not pertinent to the present case.

***A.***      ***The Department Adopts a General Permit for Small MS4s in Maryland***

     1.      Process for Adoption of the General Permit

After the EPA had adopted the initial version of its Phase II regulations for MS4 permits, the Department issued its first general permit for Phase II MS4s, including small MS4s, in 2003. Among other things, that general permit required implementation of the six minimum control measures specified in the EPA regulations. *See* Maryland Department of the Environment, Fact Sheet (December 2016). Although that general permit had a five-year term, it was administratively extended beyond 2008 by the Department while the EPA Phase II regulations were litigated and ultimately remanded to the EPA for revision. *See* Part II.B and footnote 10 of this opinion. In 2016, the EPA issued its revised regulations for small MS4s, and the Department moved forward to develop a new general permit for small MS4s.

During mid-2016, the Department consulted with the EPA concerning its draft general permit for small MS4s in light of the EPA's amended regulations and revised the draft in response to the EPA's comments. In December 2016, the Department notified the operators of 35 small MS4s in Maryland – six counties and 29 municipalities – of its tentative determination to issue a new general permit for certain small MS4s. Among those MS4 operators was Queen Anne's County.[18] Relevant to this appeal, the proposed general

---

     [18] Queen Anne's County had not been covered by the initial general permit issued in 2003. As a result of the 2010 census, the Department determined that the County's MS4 was located in an urbanized area and met the designation criteria for coverage by the EPA's Phase II regulations. *See* Small MS4 General Permit at A-2, A-4; *see also* Maryland Department of the Environment, *Designation Letter for Queen Anne's County* (Apr. 27, 2018); 2010 Census Urban and Rural Classification and Urban Area Criteria, U.S. Census

permit included a condition that an operator of an MS4 had to restore 20 percent of the total untreated impervious surface area within the urbanized area of the MS4 jurisdiction.

The Department held a public hearing on the tentative determination on February 6, 2017, at which the County's Director of Public Works testified.  In addition, the County submitted written comments by the March 30, 2017 deadline set by the Department, and also joined in comments made by the Maryland Association of Counties and other organizations.  Pertinent to this appeal, the County argued that calculation of the 20 percent impervious surface restoration requirement should be based only on acreage in the urbanized area served by the MS4, but that "mitigation efforts … throughout the County … be considered toward meeting the goals of the permit."  The County also joined similar comments made by organizations representing counties and municipalities, arguing that "permittees should be given the flexibility to conduct [impervious surface] restoration anywhere in their geographic area" to limit costs without sacrificing clean water benefits.  *See* Joint Comments of Maryland Association of Counties, Maryland Municipal League, and Maryland Stormwater Association (March 30, 2017) at 6.

On April 27, 2018, the Department published its final determination and issued the Small MS4 General Permit pursuant to its permitting authority under State law, as well as its authority as the designee of the EPA for issuance of a NPDES permit.  *See* Maryland

Bureau (Oct. 8, 2021), https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2010-urban-rural.html [https://perma.cc/XS94-BVGP] (download the "Percent Urban and Rural In 2010 by State and County" Excel sheet, see Column N urbanized area data reported for "Queen Anne's") (reporting 24,966,886 square meters of Queen Anne's County designated as "urbanized area").

24

Department of the Environment, NPDES General Permit for Discharges from Small Municipal Separate Storm Sewer Systems, General Discharge Permit No. 13-IM-5500, General NPDES Permit No. MDR055500 (April 27, 2018) ("Small MS4 General Permit"); *see also* Fact Sheet (December 2016). In a document entitled Basis for Final Determination, the Department explained decisions made in issuing the permit and responded to some of the public comments that had been made with respect to the draft general permit. Among other things, the Department adopted the recommendation made by the County and others and allowed impervious surface restoration credit for measures taken "anywhere within the jurisdiction." Basis for Final Determination at 14. The Department also indicated that an owner or operator of a small MS4 retained the option to seek an individualized permit in lieu of accepting the conditions of the general permit. Small MS4 General Permit at 18-19.

2.      Terms and Conditions of the General Permit

Parts I and II of the Small MS4 General Permit describe the scope of the permit and certain procedural requirements for an MS4 owner or operator to obtain coverage under the permit. Small MS4 General Permit at 1-2.

Part III of the permit states generally that owners and operators of MS4s covered by the permit must implement programs for controlling stormwater discharges in compliance with the Clean Water Act and related regulations. Small MS4 General Permit at 3.

The bulk of the permit's substantive requirements appear in Part IV and Part V of the permit. The permit provides that compliance with these two Parts satisfies the EPA's

25

MS4 permit standard, *i.e.*, reduction of the discharge of pollutants to the maximum extent practicable and protection of water quality standards. Small MS4 General Permit at 3.

Part IV provides details concerning implementation of the six minimum control measures, as developed and required by the EPA in its regulations. Small MS4 General Permit at 3-11.

Part V sets out the obligations of a permittee as to impervious surfaces. That Part states that the impervious surface restoration requirement is intended to make progress toward achieving pollutant reductions specified in Maryland's Watershed Implementation Plan ("WIP"). Small MS4 General Permit at 11. In contrast to a similar requirement in permits for medium and large MS4s, Part V of the permit requires small MS4 permittees to identify untreated impervious surfaces *only* within the urbanized area, not the entire jurisdiction. *Id.* at B-10; *see also* Basis for Final Determination at 14 (explaining that the Department tailored the baseline calculation to urbanized areas in response to comments received during the comment period). Of those surfaces, the permittee identifies those that have little or no existing stormwater management (*e.g.*, street sweeping, storm drain cleaning, land cover conversion). *See* Maryland Department of the Environment, *Accounting for Stormwater Wasteload Allocations and Impervious Acres Treated* (August 2014) ("Accounting Guidance") at 4. Of this untreated impervious surface area, a county must develop and implement stormwater management for 20 percent of those untreated impervious surfaces by 2025. Small MS4 General Permit at 12-13. Thus, to calculate its restoration requirement, the permittee must determine how many acres of impervious surfaces exist within its urbanized area, determine what portion of those surfaces are

26

untreated, and then divide that untreated portion by five – *i.e.*, calculate the 20 percent target required by Part V of the permit.

Part VI of the permit details recordkeeping and reporting requirements for purposes of assessing compliance with the permit conditions. Small MS4 General Permit at 15-16. Part VII of the permit contains miscellaneous standard permit conditions and sets forth, among other things, the potential penalties for violation of the permit under the Clean Water Act, as well as under various provisions of the Environment Article of the Maryland Code. *Id.* at 16-20.

## B. *The County Seeks Judicial Review of the General Permit*

On May 25, 2018, pursuant to EN §1-601, the County filed a petition for judicial review of the Department's final determination on the Small MS4 General Permit in the Circuit Court for Queen Anne's County.[19] In July 2018, the County asked the Circuit Court to stay its consideration of the petition on the ground that similar issues were to be decided by this Court in *Carroll County*, which had not yet been argued or decided. The Circuit Court acceded to that request. Following the publication of this Court's decision in *Carroll*

---

[19] The petition identified the petitioners as "Queen Anne's County and Cecil County (together, the 'Maryland Small MS4 Coalition')," all represented by the same counsel. Cecil County later withdrew from the case and dismissed its appeal in the Court of Special Appeals. The Maryland Small MS4 Coalition, described in the petition as an unincorporated association with an address in Queen Anne's County, remains the lead petitioner in the caption of the case, but Queen Anne's County is the only MS4 operator pursuing judicial review of the general permit in this case.

The City of Havre de Grace separately filed a petition for judicial review of the Small MS4 General Permit in the Circuit Court for Harford County. *In the Matter of Mayor and City Council of Havre de Grace*, No. C-12-CV-18-000164. That case was dismissed in November 2021 for lack of prosecution.

*County*, the Circuit Court issued its decision affirming the Department's final determination with respect to the Small MS4 General Permit. Memorandum and Order Affirming Agency Decision, *In re: Maryland Small MS4 Coalition, et al.*, No. C-17-CV-18-000162 (October 17, 2019).

The County pursued an appeal of that decision in the Court of Special Appeals. In a reported opinion authored by Judge Glenn T. Harrell, Jr., the Court of Special Appeals largely affirmed the decision of the Circuit Court. *Maryland Small MS4 Coalition v. Maryland Department of the Environment*, 250 Md. App. 388, 434 (2021). However, the intermediate appellate court remanded the case to the Department to allow the County to provide additional comments with respect to certain aspects of the Department's tentative determination.[20] *Id.*

The County filed a timely petition for a writ of *certiorari*, which we granted. The County raises two issues:

(1) Whether the impervious surface restoration requirement in the permit unlawfully makes the County responsible for discharges by third parties and nonpoint source runoff;

(2) Whether the minimum control measures included in the permit unlawfully impose requirements beyond the MEP standard.

With respect to both issues, the County argues that this Court should reconsider its holdings in *Carroll County*.

---

[20] The Department did not seek further review of the court's directions concerning the remand, and that part of the decision of the Court of Special Appeals is not before us.

**Standard of Review**

*A.*    *Judicial Review of Administrative Action*

As with other instances of judicial review of a final action of an administrative agency, this Court reviews directly the final determination made by the Department on the permit, not the intervening decisions of the Circuit Court and Court of Special Appeals. *Carroll County*, 465 Md. at 201. However, "[t]hat does not necessarily mean that we need cast aside the work of our colleagues on the intermediate appellate court." *Sturdivant v. DHMH*, 436 Md. 584, 587-88 (2014).

In this context, the standard of review applied by a court to the Department's determination, and the corresponding level of deference to the Department, varies depending on whether the court is reviewing fact findings, discretionary decisions, or legal conclusions.

*Fact Findings.* For fact findings, a reviewing court applies the "substantial evidence" standard, under which the court defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences. *Anacostia Riverkeeper*, 447 Md. at 120; *Carroll County*, 465 Md. at 201-02.

*Matters Committed to Agency Discretion.* With respect to matters committed to agency discretion, a reviewing court applies the "arbitrary and capricious" standard of review, which is "extremely deferential" to the agency. This standard is highly contextual, but generally the question is whether the agency exercised its discretion "unreasonably or without a rational basis." *Carroll County*, 465 Md. at 202 (citations omitted). Under this

standard, a reviewing court is not to substitute its own judgment for that of the agency and should affirm decisions of "less than ideal clarity" so long as the court can reasonably discern the agency's reasoning. *Id.*

*Legal Conclusions.* With respect to an agency's legal conclusions, a reviewing court accords the agency less deference than with respect to fact findings or discretionary decisions. *Anacostia Riverkeeper*, 447 Md. at 122. In particular, a court will not uphold an agency action that is based on an erroneous legal conclusion. *Id.* However, in construing a law that the agency has been charged to administer, the reviewing court is to give careful consideration to the agency's interpretation. *Carroll County*, 465 Md. at 202-06.

## B. *The Doctrine of* Stare Decisis

The issues presented for decision in this case are closely related to those decided in the *Anacostia Riverkeeper* and *Carroll County* cases. The doctrine of *stare decisis* – a Latin phrase meaning "to stand by things decided" – is inevitably an important consideration in our decision. That doctrine "encourages the consistent development of legal principles, public reliance on our judicial decisions, and the perceived integrity of the courts." *State v. Stachowski*, 440 Md. 504, 520 (2014). Aside from two "extremely narrow" exceptions, the Court does not disturb the holdings of prior decisions. *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 63 (2010). Those exceptions are when a prior decision was "clearly wrong and contrary to established principles," or when there have been "significant changes in the law or facts." *Id.* at 64; *see also Wallace v. State*, 452 Md. 558, 582 (2017); *Lawrence v. State*, 475 Md. 384, 416 (2021).

Although the doctrine of *stare decisis* is not absolute, the Court is particularly "reluctant to depart from the principle of stare decisis" in those "areas of the law [where] people do plan and arrange their affairs for the future in reliance upon this Court's prior rulings." *Austin v. City of Baltimore*, 286 Md. 51, 68 (1979) (Eldridge, J., concurring). Decisions concerning a complex administrative scheme fall into this category. *See People v. Mendoza*, 23 Cal. 4th 896, 924 (2000) ("A key consideration in determining the role of *stare decisis* is whether the decision being reconsidered has become a basic part of a complex and comprehensive statutory scheme, or is simply a specific, narrow ruling that may be overruled without affecting such a statutory scheme."); *see generally* Richard J. Pierce, Jr., *Reconciling* Chevron *and* Stare Decisis, 85 Geo. L.J. 2225, 2244 (1997).

## VI

### Discussion

The County presents the same questions, slightly rephrased, that were previously answered in the *Carroll County* decision. The County's arguments boil down to two fundamental issues: (1) whether a permit condition may reference an area beyond the scope of the permittee's MS4 system, and (2) whether permit conditions may exceed the MEP standard. Both of those questions were answered in *Carroll County* and application of the holdings in that case to this one is relatively straightforward. Unsurprisingly, the County requests that the *Carroll County* decision be revisited.

We address first whether there is a basis for deviating from the doctrine of *stare decisis.* Concluding that there is not, we then apply the holdings of that case to the questions before us.

31

*A.*     *Application of the Doctrine of* **Stare Decisis**

As indicated above, the Court generally will overrule a prior decision only when that decision was "clearly wrong" or when there has been a "significant change in the law or facts" since the prior decision was issued.

1.     Whether *Carroll County* was "Clearly Wrong"

The holdings in *Carroll County* that the Department may include permit conditions beyond the MEP standard and allocate nonpoint source pollution to MS4 permits to protect water quality were not "clearly wrong." As the decision in *Carroll County* elaborated, those conclusions are supported by the plain text of the statute, by the EPA's formally articulated interpretation of the Act as well as regulations adopted under the Act, and by the extant federal case law. *Carroll County*, 465 Md. at 210-24. With all of these sources supporting the Department's view that it may consider water quality standards in devising conditions for an MS4 permit, one cannot say that *Carroll County* was "clearly wrong."

The County, however, contends that the holding in *Carroll County* concerning the role of the MEP standard was "contrary to plain language of the statute," citing a dissent in *Carroll County*. While we respectfully acknowledge there often can be multiple interpretations of a statutory text, we do not disturb this Court's original interpretation simply because we were asked twice. Moreover, the construction of the statutory text in *Carroll County* reflects the current interpretation of the statute by the EPA. If the Court was "clearly wrong" in that case, so too is the EPA. Tellingly, no court has concluded that the EPA's interpretation is wrong.

32

Aside from pointing to the dissent in *Carroll County*, the County asserts that the decision in that case was inconsistent with the decision in *Anacostia Riverkeeper*. However, in *Carroll County*, the Court explained how this argument mischaracterizes the *Anacostia Riverkeeper* decision:

> [T]he holding in *Anacostia Riverkeeper* was in response to a challenge from a different perspective. Environmental groups argued that the permit term was inadequate to comply with the MEP standard. Here, Frederick County argues, from the opposite perspective, that the permit term unlawfully exceeds that standard. However, for the reasons explicated in the text, we disagree and reach the same outcome that *Anacostia Riverkeeper* did – that the permit term is valid and authorized by the Act.

465 Md. at 213 n.41; *see also* Part III of this opinion.

The two decisions are thus quite consistent. In response to challenges from environmental groups, the *Anacostia Riverkeeper* decision concluded that the permit conditions in question satisfied the baseline MEP standard. In response to a converse challenge from permittees, the *Carroll County* decision concluded that the Act authorizes permit conditions beyond the MEP standard for the purpose of satisfying water quality standards. Together, the two decisions stand for the proposition that MS4 permit conditions must meet the MEP standard, but may do more to protect the water quality of a waterway. These two holdings are not in conflict with one another.

2.     Whether There has been a "Significant Change" of Circumstances

The County argues that, subsequent to the *Carroll County* decision, "significant actions by the EPA and the Department" amount to a change in the law or facts that counsel against application of the principle of *stare decisis*.

33

With respect to the EPA, the County points to settlement agreements that the EPA entered into with two states in December 2020 that resolved ongoing litigation and resulted in permit modifications. An agency and a regulated party may decide to settle a case for a variety of reasons – saving the time and resources that would be devoted to litigation, obtaining an expeditious result, and avoiding the risk of an adverse precedent. It would be inappropriate to infer a significant change in the EPA's interpretation of the Clean Water Act simply from its decision to settle two cases shortly before a change in federal administrations.

In any event, whatever potential change in a policy that may be gleaned from the tea leaves of a settlement agreement,[21] that speculation cannot trump the clear import of the agency's formally adopted and still existing regulations. If the EPA changes the interpretation of the Clean Water Act set forth in its regulations that govern MS4 permits, it must do so through new rules with public notice and comment as required by the Administrative Procedure Act. *See* Charles H. Koch, Jr. & Richard Murphy, 1 Admin. L. & Prac. §4.60 (3d ed. 2022); *see also* 5 U.S.C. §553. The fact that the EPA settled pending

---

[21] The County notes that the permit in one of those cases originally characterized certain conditions related to water quality in the permit as conditions "in addition to" MEP requirements, but subsequently struck the phrase "in addition to" (although it left intact the requirement to attain water quality standards). This is the only evidence that the County cites to argue that the EPA has reversed course on its longstanding interpretation of the Act. In its own explanation of the settlement, the EPA did not suggest that it was adopting a new interpretation of the Act through the settlement. *See* EPA, *Statement of Basis for Proposed Permit Modification*, available at https://www.regulations.gov/document/EPA-R01-OW-2020-0216-0005 [https://perma.cc/YSU5-EDQM].

litigation does not amount to a change in circumstances significant enough to override *stare decisis*.

Finally, the County argues that the Department "appears to have embraced the MEP standard" in the Phase III Watershed Implementation Plan. However, according to the Department, the County "mistakenly draws that conclusion" and ignores the Department's actions "making clear that restoration to the MEP standard is not the hard regulatory 'cap' that the County makes it out to be." Contrary to what the County suggests, the Department has not changed its interpretation of the Act to deviate from that of the EPA in a way that amounts to a change in the law or facts since the *Carroll County* decision was issued.

We next turn to the two issues raised by the County and the application of the decision in *Carroll County* to those issues.

**B.     *The Geographic Scope of an MS4 Permit Condition***

The County asserts that the impervious surface restoration condition and the "good housekeeping" provision – one of the "minimum control measures" required by the EPA regulations – of the Maryland Small MS4 General Permit have "unlawfully made the County responsible for discharges from independent third parties and nonpoint source runoff that does not flow into or discharge from the County's MS4." This argument is essentially the same as that made by the counties in *Carroll County.*

While the County concedes that this case involves "an ostensibly similar question [to that] in *Carroll County*," it nonetheless argues that the baseline for the restoration area (the urbanized area) impermissibly extends beyond the MS4 watershed and, as a result,

35

assigns pollution from nonpoint sources and third parties to the County.[22]  The County thus objects to the assignment of nonpoint source pollutant reductions to point sources to satisfy water quality standards.  This reprises an argument made by the counties in *Carroll County*.  But, as explained in *Carroll County*, "nonpoint source pollution reduction may be assigned to point sources" to protect water quality standards.  *Carroll County*, 465 Md. at 235-37.  Just as "[t]he Department did not exceed its authority under the Clean Water Act when it directed calculation of the impervious surface using a county-wide baseline," *id.* at 238, it did not do so here in using a more limited baseline – the urbanized area of the County.

As with the medium MS4 permits in *Carroll County*, nothing in the Small MS4 General Permit requires that the measures taken to satisfy the restoration condition take place outside the MS4 service area.  *See Carroll County*, 465 Md. at 230.  If the County desired, it could devote its efforts to satisfy that condition solely within the watershed region of its MS4 to ensure that its efforts clean up pollutants that would first enter its MS4 before making their way to the Chesapeake Bay, rather than pollutants that head straight for the Bay.  From this perspective, the fact that the County may choose to satisfy a permit condition through restoration efforts over a broader geographic area affords the County greater flexibility while still contributing to the clean-up of the Bay and its tributaries.

---

[22] A primary distinction between the permit at issue in this case and the permit under review in *Carroll County* is that this case involves a general permit for *small* MS4s while the latter case involved permits for *medium* MS4s.  However, this argument has even less force in this case.  Under the medium MS4 permits at issue in *Carroll County*, a county had to assess impervious surfaces throughout the *entire* county.  465 Md. at 229-30.  In contrast, under the Maryland Small MS4 General Permit, the County is to determine the baseline according to the impervious surfaces *within the urbanized area* of the County.  *See* Small MS4 General Permit, Appendix B, Section III(A)(1) at B-10.

As a matter of both principle and practice, the County apparently does not oppose a permit condition that credits a permittee for measures taken outside the geographic bounds of the MS4. In its comments to the Department concerning the draft general permit, the County noted that "[m]itigation and restoration practices throughout the County will result in improved water quality in the Bay and tributaries" and urged that mitigation efforts "throughout the County" be counted toward meeting the 20 percent restoration requirement. Moreover, it urged that the Department allow "nutrient trading," also known as "water quality trading" – a process by which a permittee may receive credit for pollution reductions made by others[23] – as part of the County's compliance with permit conditions. The Department adopted both of these recommendations in the final version of the Small MS4 General Permit. Under the permit, the County will receive credit for the restoration efforts undertaken anywhere within the County. *See* Basis for Final Determination at 13-14. The permit also allows for water quality trading pursuant to regulations adopted by the Department. *Id.* at 18, 25; Small MS4 General Permit at 11; COMAR 26.08.11.

In practice, it appears that the County has already taken advantage of the flexibility afforded by the permit condition and has reported that it is well on its way to satisfying the impervious surface restoration requirement. It has calculated the 20 percent restoration condition applicable to the County to be 190 acres (0.30 square miles).[24] *See* Queen Anne's

---

[23] "Water quality trading," is "a method for complying with discharge permits that uses market forces to reduce overall pollution at lower cost by shifting pollution reduction activities from one entity to another." *Carroll County*, 465 Md. at 258-59.

[24] The County consists of 238,610 acres of land. Only 6,111 of those acres are in an "urbanized area" – approximately 2.6 percent of the County. Under the permit, the

County, MS4 Comments at 3 (March 30, 2017) ("Queen Anne's County Comments"). Thus, to satisfy the impervious surface restoration condition under Part V of the Small MS4 General Permit, the County must implement restoration management practices equivalent to 0.30 square miles of impervious surface restoration, which may include practices such as mechanical street sweeping, reforestation, impervious surface replacement, storm drain vacuuming, septic pumping, and more. *See* Accounting Guidance at 4. Under the permit, the location of the resulting restoration efforts is within the County's discretion and may occur anywhere within the County. The County has reported that it has a project underway that provides three times the amount of required restoration.[25]

The County also argues that its small MS4 was not assigned any wasteload allocation for nonpoint source pollution in the Chesapeake Bay TMDL, and thus it cannot now take on responsibility for additional pollution to protect water quality. First, the County's argument mischaracterizes the 2010 Chesapeake Bay TMDL. None of the Bay TMDL allocations was specific to a jurisdiction; instead, each is assigned to a segment of

---

County determines how many of those 6,111 acres are impervious surface, ascertains how much of that impervious surface is untreated, and *then* takes 20 percent of the latter number. Queen Anne's County has estimated that its restoration requirement is 190 acres – or 0.30 square miles. *See* Queen Anne's County Comments at 3.

[25] The County has undertaken a sewer extension project to remove and retire 1,526 failing septic systems on Kent Island, which have been discharging effluent into waters of the State for many decades. Queen Anne's County Comments at 5. This project is equivalent to 595 acres of impervious surface restoration. *See* Accounting Guidance at 4 (noting that every septic connection amounts to 0.39 equivalent acres of credit). Thus, once the County completes its sewer replacement project, it will have accomplished three times the impervious restoration condition in Part V of the general permit.

38

impaired waters.[26]  When preparing the Phase I WIP that the EPA relied on in developing the Bay TMDL, the Department organized each segment's pollution loads by county and by source sector, including urban stormwater runoff in Queen Anne's County.[27]  The Department further divided the loads into regulated and non-regulated sources, the latter of which included the County's stormwater, as it was not yet an MS4 permittee.  The Phase I WIP thus assigned load allocations to the County, because the County had stormwater-related impairments but was not yet an MS4 permittee.  It is simply incorrect to say that the County was not included in the pollution allocation planning process under the Bay TMDL.

Moreover, the fundamental question is not whether the permit conditions are necessary to achieve the TMDL, but rather whether they are necessary to protect the water quality of the Chesapeake Bay.  The former is merely a tool to achieve the latter.  The ultimate question is whether conditions included in permits for point sources may take account of nonpoint source pollution when necessary to achieve water quality standards.  The short answer is given in the EPA's regulations, which require all MS4 permits to include "[m]ore stringent terms and conditions … based on an approved total maximum

---

[26] *See generally* EPA, Section 9: Chesapeake Bay TMDL (Dec. 10, 2010), https://www.epa.gov/sites/default/files/2014-12/documents/cbay_final_tmdl_section_9_final_0.pdf [https://perma.cc/ZP6Z-BC2R].

[27] *See* Maryland Department of the Environment, Summary of Phase I WIP Loads – Queen Anne's at 3 (Apr. 5, 2011), https://mde.maryland.gov/programs/Water/TMDL/TMDLImplementation/Documents/Handouts/Handout_QueenAnnes.pdf [https://perma.cc/J9BX-J39N].

daily load (TMDL) or equivalent analysis, or where the Director determines such terms and conditions are needed to protect water quality." 40 CFR §122.34(c)(1).

As Judge Harrell aptly summarized this issue for the Court of Special Appeals:

> [T]he impervious surface restoration requirement in the general permit, like that in *Carroll County*, is an authorized water quality based effluent limitation that represents a valid reallocation of pollutant loads from nonpoint sources to point sources and that implements a stormwater wasteload allocation in the Bay TMDL. Accordingly, … the Department did not exceed its authority under the Clean Water Act when it directed calculation of the impervious surface to be restored based on the total impervious surface within the urbanized area of the County that has little or no stormwater management.

250 Md. App. at 425-26 (footnote omitted).

The County also takes issue with the "good housekeeping" provision of the permit – one of the six minimum control measures required by the EPA's regulations – which requires the County to provide training to its employees on how to mitigate and report spills of pollutants on County-owned property that contribute to the nonpoint source pollution of the Chesapeake Bay. Small MS4 General Permit at 9-10. The County argues that this provision is unlawful because it requires the County to take preventative measures beyond the MS4's service area. As the Court held in *Carroll County*, "nonpoint source pollution reduction may be assigned to point sources" to protect water quality standards. *Carroll County*, 465 Md. at 235-37. Requiring the County's employees to be trained on how to avoid pollutant spills throughout the County is a proxy for allocating nonpoint source pollution to the MS4 point source. This "good housekeeping" provision is required by EPA regulations that refer to "municipal operations" broadly, without any restriction to operations solely within an MS4 service area. *See* 40 CFR §122.34(b)(6)(i) ("The permit

40

must identify the minimum elements and require the development and implementation of an operation and maintenance program that includes a training component and has the ultimate goal of preventing or reducing pollutant runoff from municipal operations.").

Finally, the County argues that the Small MS4 General Permit allocates pollution of other *point* sources to the County, whereas *Carroll County* only stood for the proposition that *nonpoint* source pollution may be allocated to the County through the MS4 permit. This is simply not the case. When the Small MS4 General Permit refers to impervious surfaces not on property owned by the County, it is only for the purposes of calculating a baseline measurement for computing the 20 percent restoration condition. It does not somehow make the County liable for third-party point source discharges. As indicated above, the County has discretion where and how to accomplish the required restoration. The Court upheld the use of such a method as a rational metric for a permit condition in *Carroll County*. 465 Md. at 235. As noted above, the impervious surface restoration requirement imposes less of an obligation on the County in this case than it did in *Carroll County*. Any legal responsibility for third-party point source discharges remains with the third-party, not the County.[28]

---

[28] To argue otherwise, the County observes that some of the impervious surfaces in its urbanized area might drain into other point sources, such as private stormwater drainage systems. Whatever benefit impervious surface restoration may provide to discharges from other point sources, it does not shift the legal responsibility for third-party point source discharges to the County. As indicated above, the County has discretion where and how to accomplish the required restoration. Any point source pollution benefit is a byproduct of the flexibility allowed by the Small MS4 General Permit that was requested by the County and other commenters. In a similar fashion, the water quality trading option requested by the County and allowed by the permit contemplates that the County could

Nor do the minimum control measure conditions in the permit make the County responsible for third-party point source discharges. The "good housekeeping" provision requires training of the County's employees to mitigate and prevent pollutant spills and discharges on County property that would eventually be washed away and add to nonpoint source pollution entering the Bay.

## C.      *Permit Conditions and the MEP Standard*

In a variation on the general argument that the MEP standard should be regarded as a cap on conditions in an MS4 permit, the County asserts that minimum control measures set forth in Part IV of the Small MS4 General Permit unlawfully exceed the MEP standard. These minimum control measures – such as mapmaking, annual screening, and "good housekeeping" – are required by the EPA's regulations and exist to satisfy the MEP standard.[29]

---

satisfy the restoration requirement as a result of measures taken by third-party point sources.

[29] 40 CFR §122.34(b) ("The permit must include requirements that ensure the permittee implements, or continues to implement, the minimum control measures … . (3) (i)…At a minimum, the permit must require the permittee to: (A) Develop, if not already completed, a storm sewer system map, showing the location of all outfalls and the names and location of all waters of the United States that receive discharges from those outfalls; … (6) (i) The permit must … require the development and implementation of an operation and maintenance program that includes a training component and has the ultimate goal of preventing or reducing pollutant runoff from municipal operations"); *see* Part II.B of this opinion; *see also* EPA 1999 Small MS4 Permit Regulations, 64 Fed. Reg. at 68,754 ("Compliance with the conditions of the general permit and the series of steps associated with identification and implementation of the minimum control measures will satisfy the MEP standard.").

These minimum control measures do not exceed MEP, but rather satisfy it. In reviewing the Small MS4 General Permit, the Court of Special Appeals analyzed in detail the minimum control measures in the permit, as well as the public comments concerning the measures and the Department's responses to those comments, and concluded that the administrative record supported the conclusion that those measures did not exceed the MEP standard. 250 Md. App. at 427-34.[30] We adopt that analysis as our own.

The County has not provided an example of how, if at all, the General Permit's minimum control measures might exceed the federal regulatory minimum. In any event, to the extent those measures could be said to exceed the MEP standard, that would be permissible under the Act and EPA regulations to protect water quality standards. *See* 40 CFR §122.34(c) ("As appropriate, the permit will include … [m]ore stringent terms and conditions, including permit requirements that modify, or are in addition to, the minimum control measures … where [] needed to protect water quality."). Indeed, the Department

---

[30] For example, in summarizing the court's analysis of the "good housekeeping" provision, Judge Harrell stated:

> [T]he Department's response to concerns that the good housekeeping provisions were beyond MEP addressed satisfactorily those concerns. The County does not argue otherwise, nor does it assert any other reason why the provisions are beyond MEP. Moreover, the requirements in the general permit appear to be consistent with the guidance provided in the regulation regarding the activities, schedules, and procedures that permit conditions should address. Accordingly, … the Department did not act unreasonably or without a rational basis in exercising its discretionary authority, pursuant to [federal regulations] to identify the minimum elements of a pollution prevention and good housekeeping program for property owned or operated by permittees.

250 Md. App. at 433-34.

explained in the Small MS4 General Permit that compliance with the minimum control measures is necessary to satisfy both the MEP standard and the State's water quality standards. *See* Small MS4 General Permit at 3. Thus, the EPA and the Department view these minimum control measures as serving both the MEP standard and the satisfaction of water quality standards – to the extent they are different – and does not treat them as mutually exclusive goals.

To summarize, MS4 permit conditions must satisfy the MEP standard, but they may do more to protect water quality standards. This is precisely what the Department has done here in the Small MS4 General Permit, with guidance and approval from the EPA. This supplementary relationship between MEP and water quality standards is based on the text of the statute, the EPA's interpretation of the Act, and this Court's analysis in *Carroll County*. That decision analogized the relationship between MEP and water quality standards in MS4 permits to the relationship between technology-based effluent limitations and water quality limitations in typical NPDES permits. *Carroll County*, 465 Md. at 212-13. In both types of permits, there is a minimum standard, and in both types of permits, the permitting authority may increase the stringency of those standards to protect water quality. Such was the case in *Carroll County*, and such again is the case here.

# VII

## Conclusion

It is a privilege to live near the Chesapeake Bay.  As State law acknowledges in many ways,[31] there is in turn a responsibility to protect it.  We have no doubt that the County, no less than the Department and the EPA, hopes to protect a body of water that lies at the heart of our State, our culture, and our economy.  Fifty years ago, Congress sought to make the waters of the United States, including the Bay, fishable and swimmable, and established the NPDES permitting program under the Act to further that fundamental goal.  That program assigns a key role to MS4 permittees like the County and permitting agencies like the Department under a scheme of cooperative federalism.  We hold that, consistent with this Court's decision in *Carroll County*, the Department's Small MS4 General Permit is a lawful effort to implement the program created by the Clean Water Act.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY PETITIONERS.**

---

[31] *E.g.*, EN §5-1101(b) (declaration of legislative policy concerning Chesapeake Bay and tributaries); EN §9-321 (Chesapeake Bay monitoring program); Maryland Code, Natural Resources Article ("NR"), §8-202 (responsibility of Department of Natural Resources for conservation of Chesapeake Bay); NR §8-1801 *et seq.* (Chesapeake and Atlantic Coastal Bays Critical Area Protection Program); Maryland Code, General Provisions Article, §7-601 (Chesapeake Bay Awareness Week).

IN THE COURT OF APPEALS
OF MARYLAND

No. 25

September Term, 2021

MARYLAND SMALL MS4 COALITION, ET AL.

v.

MARYLAND DEPARTMENT
OF THE ENVIRONMENT

*Getty, C.J.,
*McDonald
Watts
Hotten
Booth
Biran
Adkins, Sally D. (Senior
Judge, Specially Assigned),

JJ.

Concurring Opinion by McDonald, J.,
which Hotten and Adkins, JJ., join

Filed: June 1, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

I agree with the result and rationale of the Majority Opinion. I write separately to acknowledge the elephant in the room. The Small MS4 General Permit bears two numbers, one State and one federal, in recognition of the fact that the Department issued it pursuant to the substantive permitting authority that Maryland law grants to the Department – an authority quite apart from the Department's designation as a permitting authority under the federal Clean Water Act. The language and legislative history of the Clean Water Act are clear that Congress intended that statute both to set a minimum standard and to preserve the States' authority to do more. And the language and legislative history of the Maryland statutes are equally clear that the General Assembly likewise regarded the federal law as the minimum standard and conferred authority on the Department to do more. Thus, State law provides an independent source of authority for the Department to issue MS4 discharge permits, quite apart from the Department's authority under federal law.

The issue of the Department's permitting authority with respect to MS4s is before this Court for the third time in the last six years and may appear again in the future.[1] A consideration of how the County's arguments fare under State law is perhaps overdue and may be useful for the future.

---

[1] See *Maryland Department of the Environment v. Anacostia Riverkeeper*, 447 Md. 88 (2016); *Maryland Department of the Environment v. County Commissioners of Carroll County*, 465 Md. 169 (2019). Notably, an appeal pending in the Court of Special Appeals purports to raise precisely the same issues presented in this case and previously decided in *Carroll County*. *See County Commissioners of Charles County v. Maryland Department of the Environment*, CSA-REG-1231-2021.

# I

## Stormwater Control and Federalism

Prior to 1972, water pollution control was left primarily to the states. *See* S. Rep. No. 92-414 (1971) at 1 ("Federal legislation in the field of water pollution control has been keyed primarily to an important principle of public policy: The States shall lead the national effort to prevent, control and abate water pollution.").

When Congress enacted the Clean Water Act in 1972, it established a cooperative federal-state division of enforcement authority, assigning primary regulation of point sources to the Environmental Protection Agency ("EPA"), or the designated permitting authorities, and leaving regulation of nonpoint sources primarily to the states. In that Act, "Congress primarily focused its regulation … on point sources, which tended to be more notorious and more easily targeted, in part because nonpoint sources were far more numerous and more technologically difficult to regulate." *Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 780 (9th Cir. 2008) (citing S. Rep. No. 92-414 (1971) at 39). Congress was careful to preserve the authority of the states, especially as to nonpoint sources. 33 U.S.C. §1251(b) (entitled "Congressional recognition, preservation, and protection of primary responsibilities and rights of States"); 33 U.S.C. §1370 (saving clause for state authority); *see also* S. Rep. No. 92-414 (1971) at 78 ("In order to further clarify the scope of the [] Act the Committee has added a definition of point source to distinguish between control requirements where there are specific confined conveyances, such as pipes, and control requirements which are imposed to control runoff. The control of pollutants from runoff is applied pursuant to section 209 and the authority resides in the

2

State or local agency."); *Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281, 299 (3d Cir. 2015) ("[The Clean Water] Act assigns the primary responsibility for regulating point sources to the EPA and nonpoint sources to the states.").

Federal law still leaves to the states the primary responsibility of regulating nonpoint source pollution. The Supreme Court has recognized that as to "nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States." *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1471 (2020). The Court explained, "Over many decades, and with federal encouragement, the States have developed methods of regulating nonpoint source pollution through water quality standards, and otherwise." *Id.* (citing nonpoint source reports from California, Maine, and Oklahoma); *see also id.* at 1490 (Alito, J. dissenting) (arguing the "federalism interest is even stronger because the Clean Water Act itself assigns non-point-source-pollution regulation to the States and explicitly recognizes and protects the state role in environmental protection."). In short, the Clean Water Act preserved long-standing state authority to regulate nonpoint source pollution.

This federal-state balance remains true in the MS4 permitting context.[2] The only relevant limit imposed by the Clean Water Act on state law is that states "may not adopt or

---

[2] For an example of the recognition that state law may exceed federal requirements in the MS4-permitting context, see National Association of Clean Water Agencies, MS4 Stormwater Permitting Guide 46 (2018) ("The debate over whether permitting authorities can impose 'beyond MEP' permit conditions – such as mandating strict compliance with water quality standards or numeric limits – may be academic in some states. The [Clean Water Act] gives states latitude to impose requirements that are more stringent than the [Clean Water Act]. A number of states have taken advantage of this authority to impose

3

enforce" a standard that is "less stringent" than the Clean Water Act. 33 U.S.C. §1370. Indeed, the Act expressly preserves state authority to *do more* – the Clean Water Act may not be "construed as impairing or in any manner affecting any right or jurisdictions of the States." *Id.*; *see also* 40 CFR §123.25(a) ("States are not precluded from omitting or modifying any provisions to impose more stringent requirements"). And, as is particularly relevant to this case, states may exercise this more stringent authority in conjunction with the Act's permitting system. *See, e.g.*, *Tahoe-Sierra Pres. Council v. State Water Res. Control Bd.*, 210 Cal. App. 3d 1421, 1431 (Cal. Ct. App. 1989), *reh'g denied and opinion modified* (June 28, 1989) (upholding as an exercise of state authority a NPDES permit provision prohibiting discharges from new development where the amount of impervious surface exceeds set guidelines). There is no requirement of separate permits for the exercise of federal authority and state authority. *Id.* at 1436.

In a number of cases, the Supreme Court has debated the outer boundaries of a federal regulator's authority under the Clean Water Act. In those opinions, federalism concerns run strong. *See, e.g.*, *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001) (rejecting the federal agency's interpretation of the Act's phrase "navigable waters" so as "to avoid the significant constitutional and federalism questions"); *Rapanos v. United States*, 547 U.S. 715, 737 (2006) (plurality opinion) (suggesting that federal agency's expansive interpretation of "navigable waters" would bring "virtually all 'plan[ning of] the development and use ... of land and water

requirements under State law that result in MS4 permit conditions that exceed the MEP standard."), available at https://perma.cc/T3RB-KBGN.

4

resources' by the States under federal control"); *County of Maui*, 140 S. Ct. at 1471 (2020) (doubting "Congress intended to give EPA the authority to apply the word 'from' in the Act in a way that could interfere as seriously with states' traditional regulatory authority – authority the Act preserves and promotes – as the Ninth Circuit's 'fairly traceable' test would.").

The concern in these Clean Water Act cases was whether a federal agency had tread too far on traditional state authority. But the present case is not just about the authority of a federal agency; it is also about the authority of a State agency under Maryland law.

Federal law does not set the outer bounds of a state's authority unless the federal law preempts state law or state law explicitly limits itself to the bounds of federal law. Neither is true here. As outlined above, the Clean Water Act does not preempt state authority to regulate nonpoint source pollution – quite the opposite. And unlike other states' laws, Maryland law does not purport to limit itself to the boundaries of the Clean Water Act. Thus, it is State law, not federal law, that ultimately controls, and the appropriate question is whether, apart from the Clean Water Act, Maryland law authorizes the Department to issue the Small MS4 General Permit.

## II

### Maryland Law Authorizing Small MS4 Permits

As the Majority Per Curiam Opinion indicates, State law authorizes the Department to regulate the State's waters and to execute its duties as the designated NPDES permitting authority for Maryland. Maryland Code, Environment Article ("EN"), §9-253; COMAR 26.08.04.01. But State law does more than that. It independently authorizes the

Department to set water quality and effluent standards. It also makes clear that the permitting program under the Clean Water Act sets a baseline for the State standards. The statute provides:

> (a) The Department may adopt rules and regulations that set, for the waters of this State, water quality standards and effluent standards. These standards shall be designed to protect:
>
> > (1) The public health, safety, and welfare;
> >
> > (2) Present and future use of the waters of this State for public water supply;
> >
> > (3) The propagation of aquatic life and wildlife;
> >
> > (4) Recreational use of the waters of this State; and
> >
> > (5) Agricultural, industrial, and other legitimate uses of the waters of this State.
>
> *          *          *
>
> (c) Effluent standards set under this section *shall be at least as stringent as* those specified by the National Pollutant Discharge Elimination System.

EN §9-314(a),(c) (emphasis added). The phrase "at least as stringent as" does not confine the Department's authority to that provided by federal law, but rather contemplates that the permits issued by the Department under State law may include conditions that exceed those mandated by the federal NPDES program. This Maryland law sets federal law as the floor, not the ceiling, for the standards used in permits issued by the Department to protect water quality.[3]

_____

[3] Not all states have chosen the same path. Some have confined state permitting agencies to the limits of federal law. But, in those instances, the state law does so expressly. For example, North Carolina law plainly prohibits its environmental regulator from "impos[ing] a more restrictive standard, limitation, or requirement than those imposed by federal law or rule ...." N.C. Gen. Stat. §150B-19.3(a) (2021). Similarly, Arizona law provides that its environmental agency is to "[a]dopt, by rule, a permit program for [waters of the United States] that is consistent with *but not more stringent than* the requirements

The legislative history of the statute demonstrates that the General Assembly has contemplated, since the first enactment of the State stormwater management law, that the State environmental regulator could require more than the federal baseline to achieve water quality goals. The "at least as stringent as" language first appeared in the Maryland Code in 1973, the year after Congress enacted the Clean Water Act and created the NPDES permitting program. *See* Chapter 739, Laws of Maryland 1973 (Senate Bill 1075 (1973)), *originally codified at* former Article 96A, §27(a) *and* re*codified with only stylistic changes at* Natural Resources Article ("NR"), §8-1405(b) pursuant to Chapter 4, 1ˢᵗ Spec. Sess., Laws of Maryland 1973 at p. 1233. As codified in the Natural Resources Article following its enactment, the statute read as follows:

> The [Water Resources] Administration [of the Department of Natural Resources] may set water quality and effluent standards. – The Administration may set water quality and effluent standards applicable to the waters of the State or portions of it. The standards shall protect public health, safety, and welfare and the present and future use of the waters for public water supply, the propagation of fish and other aquatic life and wildlife, recreational purposes, and agricultural, industrial, and other legitimate uses. All standards may be amended from time to time by the administration *and shall include but not be limited to*:
>
> …

---

of the [C]lean [W]ater [A]ct …." Ariz. Rev. Stat. Ann. §49-203(A)(2) (2022) (emphasis added). There are other examples. *E.g.*, Wis. Stat. Ann. §283.11 (2021) ("Rules concerning storm water discharges *may be no more stringent than* the requirements under the federal water pollution control act ….") (emphasis added); Mont. Code Ann. §75-5-203 (2021) ("[T]he [department of environmental quality] may not adopt a [water quality standard] rule ... that is more stringent than the comparable federal regulations or guidelines that address the same circumstances."); *cf.* Neb. Rev. Stat. §81-1505 (2022) ("The council shall adopt and promulgate rules and regulations no more stringent than the provisions of section 1453 et seq. of the federal Safe Drinking Water Act").

(2) Effluent standards specifying the maximum loading or concentrations and the physical, thermal, chemical, biological, and radioactive properties of wastes which may be discharged into the waters; standards *shall be at least as stringent as those specified by the national pollutant discharge elimination system*;

NR §8-1405(b) (emphasis added). The provision was later recodified in the Environment Article as EN §9-314 and the authority granted by the statute was transferred to the newly-created Department of the Environment as part of a reorganization of State government. Chapter 240, Laws of Maryland 1982; Chapter 306, Laws of Maryland 1987.[4]

Other provisions in Title 9 of the Environment Article reinforce the Department's authority to enact more stringent permit standards. *See* EN §9-319(a)(7) & (10) (authorizing the Department to "issue … permits that prohibit discharges of pollutants … or to adopt any other reasonable remedial measures to prevent, control, or abate pollution or undesirable changes in the quality of the waters of this State" and to exercise incidental powers for that purpose); EN §9-326 ("The Department may make the issuance of a discharge permit contingent on any conditions the Department considers necessary to prevent violation of [the State water pollution control law]"). The Department has adopted several chapters of regulations for discharge permits issued under State law or the federal

---

[4] As is evident, in its original iteration, the statute not only stated that standards imposed by the State agency were to be "at least as stringent as" NPDES permitting standards, but also included an introductory phrase stating that the agency's standards "shall include but not be limited to" NPDES standards. This belt and suspenders approach was eliminated in the 1982 recodification in the Environment Article when the phrase "shall include but not be limited to" was edited out of the statute. The Revisor's Note made clear that no change in substance was intended, as it stated that the new codification consisted of "new language derived without substantive change from former NR §8-1405(b)." *See* Chapter 240, Laws of Maryland 1982 at 2203.

NPDES program. COMAR 26.08.04.01A ("The Department shall issue State discharge permits or NPDES permits in accordance with the provisions and conditions of COMAR 26.08.01 – 26.08.04 and 26.08.08 to satisfy the requirements of the [the NPDES program].").

The County argues that the State statute should not be construed according to its plain meaning – a meaning also contemplated by Congress in the Clean Water Act – because, in its view, the Department would then have "boundless" authority and the "sky [is] the limit." However, this view ignores the context of the statute and the constraints on the Department's actions under it.

First, the statutory scheme requires that, when the Department adopts regulations concerning the control of water pollution, it *shall* consider, among other things, "[t]he technical feasibility of measuring or reducing the particular type of water pollution." EN §9-313(b)(6) (emphasis added); *see also Northwest Land Corp. v. Maryland Department of the Environment*, 104 Md. App. 471, 478 (1995) (noting that the Department must also consider the character of the area involved and the nature of the existing receiving body of water). Moreover, any permit term must advance the statutory goals – *i.e.*, protect public health, safety, welfare, recreation use. EN §9-314(a); *see also* EN §9-302.

Second, the Department's actions are bound by rules of administrative procedure and standards of judicial review. The Department must follow the steps set forth in EN §1-601, and its final determination and underlying reasoning is subject to review under the substantial evidence and arbitrary or capricious standards. *See Anacostia Riverkeeper*, 447 Md. at 118-19. There are traditional and adequate procedural and substantive checks in

place. Thus, the statutory standards and other constraints direct and confine Department discretion to the legislative purpose. In other words, the sky is not the limit.

Finally, the Clean Water Act and Title 9 of the Environment Article are not the Department's only source of authority to regulate stormwater. The State has long regulated stormwater. *See, e.g.*, Chapter 682, Laws of Maryland 1982, enacting stormwater management law now codified at EN §4-201 *et seq.* Initially, that law focused on control of flooding associated with new development, but improvements in stormwater management prompted an update to that approach and resulted in the Stormwater Management Act of 2007. Chapters 121, 122, Laws of Maryland 2007; *see* Revised Fiscal and Policy Note for Senate Bill 784, House Bill 786 (2007); *Anacostia Riverkeeper*, 447 Md. at 110-13. Under Title 4 of the Environment Article, the General Assembly has instructed the Department to adopt rules "concerning the impact of stormwater on waters of the State." EN §4-203(a). That law further requires the Department to set requirements for every county and municipality's stormwater management program, which must, among other things, "[p]revent, to the maximum extent practicable, an increase in nonpoint pollution." EN §4-203(b)(2)(viii)(2). Thus, federal law aside, State law specifically instructs the Department to mitigate nonpoint source pollution through stormwater management programs. Although this program is distinct from the Department's MS4 permits, it demonstrates a legislative intent to give the Department the necessary authority to address nonpoint source pollution. Moreover, as both programs serve the same goal – to protect the waters of the State – the two programs are linked. The Small MS4 General Permit issued under Title 9 of the Environment Article requires its permittees to implement

10

and adhere to the stormwater management requirements under Title 4 of that article. *See* Maryland Small MS4 General Permit at 11.

### III

### Conclusion

In sum, as is apparent on the face of the permit, the Department issued the Small MS4 General Permit under the authority delegated to the Department under two separate and distinct laws: the Clean Water Act and Maryland's more stringent stormwater permitting law. Maryland law expressly allows the Department to include permit conditions more stringent than the minimum federal standards, and the Clean Water Act explicitly recognizes the State's authority to do so. The question of whether federal law also allows the Department to include permit conditions that are "beyond the MEP standard" – as the EPA believes and has incorporated in its regulations – may well be an academic one in the context of a permit issued by the Department under Maryland law.

Judge Hotten and Judge Adkins advise that they join this opinion.

IN THE COURT OF APPEALS

OF MARYLAND

No. 25

September Term, 2021
_____

MARYLAND SMALL MS4 COALITION, ET AL.

v.

MARYLAND DEPARTMENT OF THE ENVIRONMENT
_____

*Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Adkins, Sally D. (Senior Judge, Specially Assigned),

JJ.
_____

Concurring Opinion by Watts, J., which Getty, C.J., and Booth, J., join.
_____

Filed: June 1, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, they also participated in the decision and adoption of this opinion.

Respectfully, I do not join the *per curiam* opinion in this case and write separately to set forth my reasons for concurring in the judgment of this Court, affirming the decision of the Court of Special Appeals.

Less than three years ago, in Md. Dep't of the Env't v. Cty. Commissioners of Carroll Cty., 465 Md. 169, 224, 214 A.3d 61, 94 (2019), cert. denied, ___ U.S. ___, 140 S. Ct. 1265 (2020), this Court held that, under the Clean Water Act, the Maryland Department of the Environment ("the MDE") could include requirements in a discharge permit for a municipal separate storm sewer system ("MS4") without referring to the "maximum extent practicable" standard set forth in 33 U.S.C. § 1342(p)(3)(B)(iii), a provision within the Act. We determined that the language of 33 U.S.C. § 1342(p)(3)(B)(iii) was ambiguous as to whether the "maximum extent practicable" language imposed a cap on the lawful requirements of a discharge permit and that the Environmental Protection Agency ("the EPA") had adopted an interpretation of the statute that permitted the agency to impose requirements in discharge permits that exceed the "maximum extent practicable" standard. See Carroll Cty., 465 Md. at 224, 214 A.3d at 94. We indicated that, under a doctrine known as "Chevron deference," where the language of a statute is ambiguous and the agency that administers the statute adopts a reasonable interpretation of it, a court defers to the agency's interpretation. See Carroll Cty., 465 Md. at 205-06, 214 A.3d at 83; Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984). Applying that rationale, we determined that it was lawful for the MDE to issue a discharge permit for an MS4 requiring a county to restore impervious (*i.e.*, paved) surfaces without reference to

the "maximum extent practicable" standard.  See Carroll Cty., 465 Md. at 264, 214 A.3d at 118.

In Carroll County, there were two dissenting opinions.  Each dissent took issue with the majority's holding for various reasons.  One dissent explained that a plain language analysis of 33 U.S.C. § 1342(p)(3)(B)(iii) led to the conclusion that the MDE could not lawfully issue a discharge permit for an MS4 with requirements that exceeded the "maximum extent practicable" standard.  See id. at 267, 214 A.3d at 120 (Watts, J., dissenting).  The dissent pointed out that in Md. Dep't of Env't v. Anacostia Riverkeeper, 447 Md. 88, 126, 134 A.3d 892, 915 (2016), this Court reviewed the requirements of an MS4 discharge permit and held that the requirement that the county restore 20% of impervious surfaces complied with the "maximum extent practicable" standard.  See Carroll Cty., 465 Md. at 126, 134 A.3d at 915 (Watts, J., dissenting).  The dissent explained that in Anacostia Riverkeeper, the reason this Court was tasked with determining whether a discharge permit complied with the "maximum extent practicable" standard is because the standard necessarily imposes a limitation or "ceiling" that requirements in discharge permits must not exceed.  See Carroll Cty., 465 Md. at 268-69, 214 A.3d at 121 (Watts, J., dissenting).  In other words, in addition to a plain language analysis leading to the conclusion that the "maximum extent practicable" standard in the statute imposes a cap on permissible requirements in a discharge permit, if 33 U.S.C. § 1342(p)(3)(B)(iii) did not impose such a limitation, it would have been wholly unnecessary in Anacostia Riverkeeper for us to determine whether the permit complied with the standard.  See Carroll Cty., 465 Md. at 269, 214 A.3d at 121 (Watts, J., dissenting).

The dissent concluded that the EPA's interpretation of 33 U.S.C. § 1342(p)(3)(B)(iii) was not entitled to deference because the statutory language was unambiguous. See id. at 281, 214 A.3d at 128-29 (Watts, J., dissenting). In a second dissent, Chief Judge Joseph M. Getty expressed concern with the practice of giving broad deference to agencies' interpretations of statutes and regulations and suggested that the doctrine of agency deference as recognized in Maryland should be scaled back. See id. at 281, 214 A.3d at 128 (Getty, J., dissenting).

This case involves two issues—namely, whether, in a discharge permit for an MS4, the MDE unlawfully imposed requirements that exceeded the "maximum extent practicable" standard and whether, in the discharge permit, the MDE made Queen Anne's County ("the County") responsible for discharges from third parties and nonpoint source pollution. If we were writing on a blank slate, I would agree with the County, adopt the conclusions set forth above from my dissent in Carroll County, and hold that it was unlawful for the MDE to impose requirements that exceeded the "maximum extent practicable" standard and made the County responsible for discharges from third parties and nonpoint source pollution.

This Court is not, however, writing on a blank slate. As a result, the majority opinion in Carroll County is entitled to be upheld under the doctrine of *stare decisis*. Under the doctrine of *stare decisis*, case law of this Court may be overruled under only two circumstances—namely, where an opinion was clearly wrong and contrary to established principles, or where the opinion has been superseded by significant changes in the law or the facts. See State v. Frazier, 469 Md. 627, 652, 231 A.3d 482, 497 (2020).

Neither of these circumstances exists in this instance. The County proposes that this Court overrule Carroll County and issue a new holding consistent with the views expressed in the dissents. In making the request, the County relies on the circumstance that the EPA and the MDE have purportedly recently taken the position that requirements in discharge permits for MS4s cannot exceed the "maximum extent practicable" standard, which is the conclusion reached by both dissents in Carroll County. The County advises that after this Court issued its opinion in Carroll County, the EPA settled two appeals of discharge permits for MS4s and modified the permits to refrain from going beyond the "maximum extent practicable" standard. Also, according to the County, after the opinion in Carroll County was issued, the MDE applied the "maximum extent practicable" standard in the Phrase III Watershed Improvement Plan. For its part, the MDE disputes that the discharge permits that the EPA modified (in the cases that were settled) were similar to the one at issue in this case and denies having treated the "maximum extent practicable" standard as a cap or ceiling on its authority.

In my view, the information relied on by the County—the existence of the EPA settlements and the MDE's alleged change of position—is not sufficient to support a determination that the majority opinion in Carroll County is not entitled to be upheld under the principle of *stare decisis*. Contending that a dissent was correct is not a sufficient ground for overruling a majority opinion of this Court. See DRD Pool Serv., Inc. v. Freed, 416 Md. 46, 69, 5 A.3d 45, 59 (2010). From my perspective, the actions attributed to the EPA and the MDE do not demonstrate that significant changes in the facts or law have superseded our reasoning in Carroll County. Nor do the agencies' alleged actions

demonstrate that the majority opinion was clearly wrong or contrary to established principles. The settlements in the EPA cases represent, at most, perhaps a change in the policy of the agency. The agency's policy may just as easily be changed back to the way it was when we issued the majority opinion in Carroll County. There does not appear to be any post-Carroll County reported opinion from any court that has reached a result at odds with this Court's holding in the case. In the less-than-three-year period since we issued the majority opinion in Carroll County, no new case law indicating that the decision was clearly wrong has arisen. In my view, to satisfy an exception to the doctrine of *stare decisis* and overrule the Court's holding in Carroll County, more is needed than a purported change of policy by the EPA in administering the Clean Water Act, particularly where if such a change has occurred, it may be only temporary and the MDE denies that such a change has happened.

To be sure, I continue to disagree with the substance of the majority opinion in Carroll County. The notion that our State law supplies an independent basis for upholding the General Permit, separate from its validity under the Clean Water Act, is a hypothesis with no real basis in fact. On brief in this case, as to State law, the MDE argued, without reference or citation to any COMAR regulation, that Maryland law authorizes it to "set pollution-control standards that are 'at least as stringent as those specified by the National Pollutant Discharge Elimination System.'" (Citing Md. Code Ann., Env't (1987, 2013 Repl. Vol.) ("EN") § 9-314(c)). Other than this, the MDE did not elaborate or offer support, such as COMAR regulations, for the theory that Maryland law authorized it to enact more stringent permit standards. Rather, among other things, the MDE argued that

Carroll County was correctly decided and should not be overturned. In addition, the MDE argued that the conditions of the Phase II General Permit are not impracticable and do not exceed the "maximum extent practicable" standard. The MDE contended that the Code of Federal Regulations provided authority for the imposition of more stringent standards, but did not identify any COMAR regulations that did the same.

With certainty, EN § 9-314(c) authorizes the MDE to regulate the State's waters and provides that "[e]ffluent standards set under this section shall be at least as stringent as those specified by the National Pollutant Discharge Elimination System." The reality, though, is that there is no Maryland law or regulation that has been passed or enacted that authorizes a discharge permit to contain requirements that exceed the "maximum extent practicable" standard. EN § 9-319(a)(7) and (a)(10) give the MDE the power to issue, modify, or revoke permits that prohibit discharges of pollutants into State waters and to exercise every incidental power necessary to carry out the provisions of the subtitle. EN § 9-326(a)(1) provides that the MDE "may make the issuance of a discharge permit contingent on any conditions the [MDE] considers necessary to prevent violation of this subtitle." The MDE, however, did not quote or rely on EN §§ 9-319 or 9-326 as providing authority to exceed the "maximum extent practicable" standard set forth in federal law. Similarly, the MDE did not rely on COMAR 26.08.04.01A.

The County pointed out that the MDE "fails to mention that the Code section that gives the Secretary of the Environment the authority to issue CWA permits does not include the power to exceed federal requirements[.]" The County stated that EN § 9-253 empowers the Secretary of the MDE to comply with and represent the State under the

- 6 -

Federal Water Pollution Control Act and certain COMAR provisions, such as COMAR 26.08.04.01A and COMAR 26.08.04.09C, authorize the MDE to issue State discharge permits or NPDES permits as necessary to meet the requirements of the federal act. From my perspective, a reading of the code sections and regulations set forth above does not lead to the conclusion that there is independent authority under State law to exceed the "maximum extent practicable" standard imposed by the federal statute or that the MDE was in fact acting pursuant to the alleged authority. In other words, it has not been established that the MDE has promulgated any regulations that authorize a more stringent standard than that contained in federal law or that State law provides an independent basis on which the MDE may do so.

This Court's holding in Carroll County was based on an interpretation of the Clean Water Act and perhaps for the reasons discussed in the dissenting opinions, there will come a point in the future that the opinion will be overruled. At this juncture, though, as expressed in my concurring opinion in Leidig, "I think that we should adhere to the principle of *stare decisis* in determining whether to make such a change and not sacrifice the integrity of our caselaw that the principle of *stare decisis* fosters." Leidig v. State, 475 Md. 181, 260, 256 A.3d 870, 918-19 (2021) (Watts, J., concurring). In this case, for the reasons expressed herein, I am compelled to agree with the affirmance of the judgment of the Court of Special Appeals.

Chief Judge Getty and Judge Booth have authorized me to state that they join in this opinion.

Circuit Court for Queen Anne's County
Case No.: C-17-CV-18-000162
Argued: December 7, 2021

IN THE COURT OF APPEALS
OF MARYLAND

---

No. 25

September Term, 2021

---

MARYLAND SMALL MS4 COALITION,
ET AL.

v.

MARYLAND DEPARTMENT
OF THE ENVIRONMENT

---

*Getty, C.J.,
*McDonald
Watts
Hotten
Booth
Biran
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

---

Concurring Opinion by Booth, J.,
which Getty, C.J., and Watts, J., join.

---

Filed: June 1, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, they also participated in the decision and adoption of this opinion.

Respectfully, I do not join the *per curiam* opinion and write separately to express my reasons for concurring in the judgment only. I agree with the *per curiam* opinion that the holdings in this Court's decision in *Maryland Department of the Environment v. County Commissions of Carroll County*, 465 Md. 169 (2019), *cert. denied*, 140 S. Ct. 1265 (2020) ("*Carroll County*") govern this case. For this reason, I agree that the judgment of the Court of Special Appeals must be affirmed.

*Carroll County* was considered by my colleagues during the term when I joined the Court. Had I been a member of the Court when this case was considered, notwithstanding the well-written majority opinion authored by Judge McDonald, I would have joined the dissenting opinion by my colleague, Judge Watts, which was joined by Judge Hotten and Judge Getty. However, I am bound by the doctrine of *stare decisis* and must respect the Court's decision in *Carroll County*, which controls the outcome here.

As more fully discussed in the *per curiam* opinion, *stare decisis* means "to stand by the thing decided and is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Meyer v. State*, 445 Md. 648, 669 (2015) (quoting *State v. Waine*, 444 Md. 692, 699–700 (2015)) (internal quotations omitted). In *State v. Stachowski*, 440 Md. 504, 520 (2014), we reiterated that "[t]he crux of the doctrine of *stare decisis* is that courts should reaffirm, follow, and apply ordinarily the published decisional holdings of our appellate courts even though, if afforded a blank slate, the court might decide the matter differently." (Citations omitted).

We depart from precedent only in two instances. First, where the decision is "clearly wrong and contrary to established principles," and second, when "there is a showing that the precedent has been superseded by significant changes in the law or facts." *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 64 (2010). While I may agree with the legal analysis expressed by the dissent in *Carroll County*, a mere disagreement with the majority is not a sufficient reason to overrule precedent. In other words, although I may feel that the *Carroll County* decision was wrong, I cannot say that it was clearly wrong and contrary to established principles—a high standard for any litigant to satisfy to convince us to overturn precedent. Nor has the decision been superseded by significant changes in the law. Adherence to this Latin phrase is not some outmoded vestige of the common law that has lost its relevance—*stare decisis* remains a bedrock of the American judicial system. The public must have confidence that our precedent will not be overturned based upon the individual views of any one judge, or that our jurisprudence will be decided in a ping-pong fashion as the composition of the Court changes.

Judge McDonald's concurring opinion raises an interesting issue concerning the State's authority to adopt rules and regulations that are more stringent than the regulations promulgated by the Environmental Protection Agency ("EPA"). That issue received little discussion or briefing before this Court. Indeed, in its brief, the State devoted but a *single sentence* to the notion that Maryland law authorizes the Department to set pollution control standards that are "at least as stringent as those specified by the National Pollutant Discharge System." (Citing Md. Code Ann., Environment Article ("EN") § 9-314(c)). Read in context, EN § 9-314 gives the Department the authority to "*adopt rules and*

2

*regulations* that set, for the waters of this State, water quality standards and effluent standards." *See* EN § 9-314(a), (c) (emphasis added). Where the Department chooses to exercise the authority to adopt its own rules and regulations, it may only do so after complying with the requirements of the subtitle, as well as the requirements of the Administrative Procedure Act. EN § 9-316. As we discuss extensively in *Carroll County* and the *per curiam* opinion in this case, the EPA has promulgated extensive regulations for the permitting of MS4s. The Department has not.[1] Giving the Department the *authority* to promulgate regulations is, of course, a separate and distinct issue from the *application* of any hypothetically enacted regulations that may apply in connection with issuance of a hypothetical permit. That discussion, however, will await another day.

Chief Judge Getty and Judge Watts have authorized me to state that they join this opinion.

_____

[1] Indeed, the very title of the Department's regulations reflect that they cover the "*Administration of the Federal NPDES Program by the State*." Code of Maryland Regulations ("COMAR") 26.08.04.07. The regulations further reflect that the Department administers the "National Pollutant Discharge Elimination System ("NPDES") program *as part of its own discharge permit system*." *Id.* (emphasis added). The COMAR regulations governing MS4 permits are devoid of any standards other than those promulgated by the EPA. *See* COMAR 26.08.04.09.C (noting that for MS4 permits, "the Department shall promulgate general permits as necessary to meet the requirements of the Federal Act, including permits for: (a) Municipal separate storm sewer systems required to be permitted under the Federal Act; and (b) Those systems designed by the Department in accordance with the Federal Act[]").

3